1  Elizabeth M. Locke, P.C.* VA Bar No. 71784
   CLARE LOCKE LLP
2  10 Prince Street
   Alexandra, VA 22314
3  Telephone: (202) 628-7400
   Email:   libby@clarelocke.com
4  *Appearance *Pro Hac Vice*

5  Michael B. McClellan, CBN 241570
   NEWMEYER & DILLION LLP
6  895 Dove Street, Fifth Floor
   Newport Beach, CA  92660
7  Telephone: (949) 854-7000
   Email:   Michael.McClellan@ndlf.com

8

9  *Attorneys for Plaintiff CoreCivic, Inc.*

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12

13  CORECIVIC, INC.,                    CASE NO:  3:20-cv-03792-WHA

14          Plaintiff,                  ASSIGNED TO: Judge William Alsup

15  v.                                  **PLAINTIFF'S OPPOSITION TO**
                                        **DEFENDANTS' SPECIAL MOTION TO**
16  CANDIDE GROUP, LLC and MORGAN       **STRIKE PLAINTIFF'S COMPLAINT**
    SIMON,
17                                      [Cal. Code Civ. Proc. §425.16]
            Defendants.
18

19                                      Date:        October 22, 2020
                                        Time:        8:00 a.m.
20                                      Location:    San Francisco Courthouse
                                                     Courtroom 7 – 19th Floor
21                                                   Golden Gate Avenue
                                                     San Francisco. CA 94102
22
                                        Action Filed (C.D. Cal.):      March 4, 2020
23                                      Action Transferred: (N.D. Cal.): July 7, 2020
                                        Trial Date:                    No Date Set
24

25  ///

26  ///

27  ///

28



## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 1

      A.    Defendants Create a Business Model Promoting "Socially Conscious" Investments—And Find Great Financial Success. .................................................. 1

      B.    The Government's "Family Separation Policy" Galvanizes the Families Belong Together Movement; CoreCivic Has Never Housed Separated Children. ............. 2

      C.    Defendants Exploit the Families Belong Together Movement and Publish False and Defamatory Statements and Implications About CoreCivic to Drive Business (Investments) Away From CoreCivic and to Themselves. ..................... 2

      D.    Defendants Published Their Defamatory Statements Despite Knowing They Are False—and Refuse to Retract Them. ................................................................. 4

LEGAL STANDARD .............................................................................................................. 5

ARGUMENT ........................................................................................................................... 6

I.     California Code Of Civil Procedure § 425.16 Cannot Apply In Federal Court .................. 6

II.    Section 425.16 Does Not Apply Here Because Defendants' Challenged Speech Falls Squarely Within The Anti-SLAPP Act's Commercial Speech Exemption. ....................... 7

III.   CoreCivic More Than Adequately Pleads Its Defamation Claims. ................................. 10

      A.    Defendants' Statute-of-Limitations Argument Fails; Defendants Republished Their Defamatory September 2018 Article in Their March 5, 2019 Article (and Republished Their March 5 Article in Their March 6 Tweet). ............................. 10

      B.    CoreCivic More Than Adequately Pleads That Defendants' Defamatory Family Separation Statements and Implications Are False. ............................................... 13

      C.    Defendants' Defamatory Statements Are Not Non-Actionable Opinion. .............. 15

      D.    Defendants' False Claims That CoreCivic Lobbies for Harsher Criminal and Immigration Laws Are Capable of Having a Defamatory Meaning. ..................... 18

      E.    CoreCivic's Complaint Pleads More Than Sufficient Facts To Plausibly Allege That Defendants' Published Their Defamatory Statements With Actual Malice. ............................................................................................................................... 20

            1.    The Actual Malice Standard Is Not Prohibitive, Especially at the Pleadings Stage. ....................................................................................... 20

            2.    CoreCivic's Complaint Pleads Facts Constituting Direct Evidence of Actual Malice—And Defendants' Requests to Disregard Those Well-

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

Pled Facts Must Be Rejected. ................................................. 21

3.      CoreCivic's Complaint Pleads Facts Constituting Circumstantial Evidence of Actual Malice. ....................................................... 23

CONCLUSION ....................................................................................................... 25

FILER ATTESTATION .......................................................................................... 26

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Grp., LLC*,
783 F.3d 1328 (D.C. Cir. 2015) ................................................................. 6

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................. 6

*Antonovich v. Superior Court*,
234 Cal. App. 3d 1041 (1991) ................................................................ 24

*Aurora World, Inc. v. Ty Inc.*,
No. 09-cv-8463, 2011 WL 13175457 (C.D. Cal. Mar. 14, 2011) ................................... 14

*Aversa v. United States*,
99 F.3d 1200 (1st Cir. 1996) ................................................................. 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................. 5, 6

*Bently Reserve LP v. Papaliolios*,
218 Cal. App. 4th 418 (2013) ................................................................ 14

*Borg v. Boas*,
231 F.2d 788 (9th Cir. 1956) ................................................................. 17

*Bostock v. Clayton Cty.*,
140 S. Ct. 1731 (2020) ........................................................................... 7

*Carbone v. Cable News Network, Inc.*,
910 F.3d 1345 (11th Cir. 2018) .............................................................. 6

*Celle v. Filipino Rep. Enters. Inc.*,
209 F.3d 163 (2d Cir. 2000) ............................................................ 20, 21

*Chapin v. Knight-Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993) ............................................................... 14

*Clark v. Viacom Int'l, Inc.*,
617 F. App'x 495 (6th Cir. 2015) ........................................................... 11

*Eastwood v. Nat'l Enquirer, Inc.*,
123 F.3d 1249 (9th Cir. 1997) ............................................................... 21

*Effron v. Am. Int'l Grp., Inc.*,
No. B198461, 2008 WL 5413647 (Cal. Ct. App. Dec. 31, 2008) ................................. 8

*Enigma Software Grp. USA v. Bleeping Computer LLC*,
194 F. Supp. 3d 263 (S.D.N.Y. 2016) ................................................... 11, 12

*Eramo v. Rolling Stone, LLC*,
209 F. Supp. 3d 862 (W.D. Va. 2016) ................................................ 12, 13, 20

NEWMEYER
DILLION

*Etheredge-Brown v. Am. Media, Inc.*,
   13 F. Supp. 3d 303 (S.D.N.Y. 2014) ................................................................................. 12

*Flowers v. Carville*,
   310 F.3d 1118 (9th Cir. 2002) ........................................................................................... 18

*Gertz v. Robert Welch, Inc.*,
   680 F.2d 527 (7th Cir. 1982) ............................................................................................. 25

*Godin v. Schencks*,
   629 F.3d 79 (1st Cir. 2010) .................................................................................................. 7

*Grasshopper House, LLC v. Clean & Sober Media, LLC*,
   No. 18-cv-923, 2018 WL 6118440 (C.D. Cal. July 18, 2018) .................................... 8, 9, 10

*Harris v. City of Seattle*,
   152 F. App'x 565 (9th Cir. 2005) ................................................................................. 20, 25

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989) ................................................................................. 20, 21, 23, 24, 25

*Hatfill v. N.Y. Times Co.*,
   416 F.3d 320 (4th Cir. 2005) .............................................................................................. 13

*Hebrew Acad. of S.F. v. Goldman*,
   42 Cal. 4th 883 (2007) ....................................................................................... 11, 12, 13

*Herbert v. Lando*,
   441 U.S. 153 (1979) ........................................................................................................... 20

*Hughes v. Hughes*,
   122 Cal. App. 4th 931 (2004) ..................................................................................... 14, 15

*Hutchinson v. Proxmire*,
   443 U.S. 111 (1979) ........................................................................................................... 21

*Ibarra v. Carpinello*,
   No. B220934, 2011 WL 925719 (Cal. Ct. App. Mar. 18, 2011) ........................................ 25

*JAMS, Inc. v. Superior Court*,
   1 Cal. App. 5th 984 (2016) .................................................................................................. 8

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) ........................................................................................................... 7

*Jimenez v. Quarterman*,
   555 U.S. 113 (2009) ........................................................................................................... 10

*Kaelin v. Globe Commc'ns Corp.*,
   162 F.3d 1036 (9th Cir. 1998) ................................................................................. 14, 21, 24

*Kasky v. Nike, Inc.*,
   27 Cal. 4th 939 (2002) ......................................................................................................... 8

*Keeton v. Hustler Mag., Inc.*,
    465 U.S. 770 (1984) ........................................................................................... 11

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ......................................................................... 5, 15

*Klocke v. Watson*,
    936 F.3d 240 (5th Cir. 2019) ............................................................................. 6

*La Liberte v. Reid*,
    966 F.3d 79 (2d Cir. 2020) ............................................................................. 6, 7

*Lawrence v. Bauer Publ'g & Printing Ltd.*,
    459 U.S. 999 (1982) ......................................................................................... 21

*Loewen v. Lyft, Inc.*,
    129 F. Supp. 3d 945 (N.D. Cal. 2015) ............................................................ 11

*Makaeff v. Trump Univ., LLC*,
    736 F.3d 1180 (9th Cir. 2013) ........................................................................... 7

*Manzari v. Assoc. Newspapers Ltd.*,
    830 F.3d 881 (9th Cir. 2016) ............................................................................. 5

*Martinez v. Combs*,
    49 Cal. 4th 35 (2010) ...................................................................................... 10

*Masson v. New Yorker Mag., Inc.*,
    960 F.2d 896 (9th Cir. 1992) ........................................................................... 24

*McKinney v. Cty. of Santa Clara*,
    110 Cal. App. 3d 787 (1980) ........................................................................... 12

*Med. Marijuana, Inc. v. ProjectCBD.com*,
    46 Cal. App. 5th 869 (2020) ....................................................................... 13, 19

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ............................................................................................. 15

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ........................................................................... 6

*Newsham v. Lockheed Missiles & Space Co.*,
    190 F.3d 963 (9th Cir. 1999) ............................................................................. 7

*Nousvo, Inc. v. Nguyen*,
    No. 11-cv-10287, 2012 WL 13012649 (C.D. Cal. July 26, 2012) ...................... 9

*Ornelas v. City of Pomona*,
    No. 09-cv-637, 2010 WL 11597412 (C.D. Cal. Apr. 15, 2010) ......................... 20

*Overstock.com, Inc. v. Gradient Analytics, Inc.*,
    151 Cal. App. 4th 688 (2007) ........................................................................... 21

*Palin v. N.Y. Times Co.*,
940 F.3d 804 (2d Cir. 2019) ........................................................................ 20, 22, 23

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
890 F.3d 828 (9th Cir. 2018),
*amended*, 897 F.3d 1224 (9th Cir. 2018) ............................................................ 5, 7

*Price v. Time, Inc.*,
416 F.3d 1327 (11th Cir. 2005),
*as modified*, 425 F.3d 1292 (11th Cir. 2005) ............................................................ 10

*ReMetrix LLC v. Ruch*,
No. A130311, 2012 WL 2704926 (Cal. Ct. App. July 9, 2012) ................................ 8

*Rodriguez v. Panayiotou*,
314 F.3d 979 (9th Cir. 2002) ................................................................................ 15

*Rosado v. eBay Inc.*,
53 F. Supp. 3d 1256 (N.D. Cal. 2014) ................................................................ 11

*Sanders v. Walsh*,
219 Cal. App. 4th 855 (2013) ................................................................................ 13

*Schiavone Constr. Co. v. Time, Inc.*,
847 F.2d 1069 (3d Cir. 1988) ................................................................................ 20

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) ................................................................................ 6, 7

*Shaver v. Operating Eng'rs Local 428 Pension Tr. Fund*,
332 F.3d 1198 (9th Cir. 2003) ................................................................................ 5

*Shively v. Bozanich*,
31 Cal. 4th 1230 (2003) ................................................................................ 11

*Shoen v. Shoen*,
48 F.3d 412 (9th Cir. 1995) ................................................................................ 23

*Solano v. Playgirl, Inc.*,
292 F.3d 1078 (9th Cir. 2002) ........................................................................ 20, 21, 24

*St. Amant v. Thompson*,
390 U.S. 727 (1968) ................................................................................ 21, 23

*State Dep't of Pub. Health v. Superior Court*,
60 Cal. 4th 940 (2015) ................................................................................ 7

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
No. 02-cv-2258, 2007 WL 935703 (S.D. Cal. Mar. 7, 2007) ................................ 11

*Sundance Image Tech., Inc. v. Inkjetmall.com, Ltd.*,
No. 02-cv-2258, 2006 WL 8455346 (S.D. Cal. June 9, 2006) ................................ 19

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
330 F.3d 1110 (9th Cir. 2003) ........................................................................ 23, 24

*Taheri Law Grp. v. Evans*,
   160 Cal. App. 4th 482 (2008) ................................................................................. 8

*Tavoulareas v. Pero*,
   817 F.2d 762 (D.C. Cir. 1987) ...................................................................... 21, 25

*Unelko Corp. v. Rooney*,
   912 F.2d 1049 (9th Cir. 1990)....................................................................... 15, 16

*Vasquez v. State*,
   45 Cal. 4th 243 (2008) ........................................................................................... 7

*Ventura v. Kyle*,
   63 F. Supp. 3d 1001 (D. Minn. 2014) ................................................................. 25

*Ventura v. Kyle*,
   825 F. 3d 876 (8th Cir. 2016)............................................................................... 25

*Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC*,
   814 F. Supp. 2d 1033 (S.D. Cal. 2011)............................................................ 9, 10

*White v. Fraternal Order of Police*,
   909 F.2d 512 (D.C. Cir. 1990) ............................................................................. 18

*Wiswell v. VerticalScope, Inc.*,
   No. 11-cv-737, 2012 WL 13136295 (W.D. Tex. Aug. 1, 2012)............................. 12

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992) ................................................................................................ 7

*Yeager v. Bowlin*,
   693 F.3d 1076 (9th Cir. 2012)........................................................................ 11, 12

**Statutes**

Cal. Civ. Code § 45 ...................................................................................................... 18

Cal. Civ. Proc. Code  § 425.16.................................................................................... 6

Cal. Civ. Proc. Code § 425.17................................................................................ 7, 8, 10

Cal. Penal Code § 26.................................................................................................... 17

Cal. Welf. & Inst. Code § 602.1.................................................................................. 17

**Other Authorities**

Fed. R. Civ. P. 12................................................................................................ 5, 6, 7, 14

Fed. R. Civ. P. 56....................................................................................................... 6, 7

**Rules**

1 Rodney Smolla, Law of Defamation § 3:71............................................................. 25

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

1 Rodney Smolla, Law of Defamation § 4:4.................................................................. 18

Restatement (Second) of Torts § 559.......................................................................... 18

Restatement (Second) of Torts § 577.......................................................................... 11

Restatement (Second) of Torts § 580A........................................................................ 25

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

**INTRODUCTION**

Although this case involves articles reporting on facts amidst the backdrop of a public discussion, it does not arise from a challenge to "partisan opinions" in "opinion pieces," as Defendants try to recast it. Mot. 1-2 (Dkt. 41). Rather, this case arises from the publication by an investor and investment firm of purported facts about CoreCivic—which they knew to be false— in a series of articles on the "Investing" section of Forbes.com (and in a tweet promoting them) in an effort to cause investors to abandon their investments in CoreCivic in favor of the "socially conscious"-branded investments Defendants market. Compl. ¶¶ 1-25. Specifically, it arises from Defendants' publication of defamatory statements and implications falsely accusing CoreCivic of "lobbying ... to push for harsher criminal justice and immigration laws" so that it can "operat[e] immigrant detention facilities for children separated from their parents at the [U.S.] border," where it is responsible for abuses in those facilities. *Id.* ¶¶ 2-3, 71-73, 120-21, 135-36. Although Defendants published their defamatory accusations during a controversy over the government's "family separation policy," make no mistake: Defendants published statements *of purported fact*— not to express "partisan opinions," but to enrich themselves at the expense of CoreCivic and the truth. *Id.* ¶¶ 14, 21-22, 46. As explained herein, Defendants' Motion to Strike must be denied because California's Anti-SLAPP Act is inapplicable to CoreCivic's claims—for multiple reasons—and because even if the Act applied, CoreCivic has more than sufficiently pled its claims.

**FACTUAL BACKGROUND**

**A.    Defendants Create a Business Model Promoting "Socially Conscious" Investments—And Find Great Financial Success.**

Defendant Morgan Simon is a registered investment advisor with two decades' experience in the financial industry. Compl. ¶ 13. To differentiate herself from a flooded field of for-profit investment advisors, Simon, who is "known for her investment work," markets herself as "speaking to a new generation" of investors by promoting "socially conscious investments." *Id.* ¶ 14.[1] She markets herself as "represent[ing] the next generation of economic movers and shakers." *Id.*

To promote, market, and sell her "socially conscious"-branded investment services, Simon co-founded Defendant Candide Group, LLC ("Candide"), a for-profit California State Registered

---

[1] *See also* Morgan Simon, Biography, http://morgansimon.com/morgans-bio.

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

Investment Advisor.  *Id.* ¶ 16.  Like Simon, Candide differentiates itself by promoting "socially conscious" investing and attempting to convince investors, institutions, and banks to divest from companies like CoreCivic and to invest in the products it pushes.  *Id.* ¶ 17.

Defendants, who promote their investing services though articles on the "Investing" section of Forbes.com, Compl. ¶ 24, Exs. A-D, G (Dkt. 1-1), have been remarkably successful in their efforts and have reaped the financial rewards.  Defendants currently have $40 million of client assets under management for which they charge substantial fees.  *Id.* ¶¶ 18-22.  The more money Defendants redirect to their "socially conscious" investments, the more they profit.  *Id.* ¶¶ 21-22.

**B.      The Government's "Family Separation Policy" Galvanizes the Families Belong Together Movement; CoreCivic Has Never Housed Separated Children.**

In 2018, controversy arose as the U.S. Government announced a new "zero tolerance" policy for illegal border-crossers.  *Id.* ¶¶ 31-32.  As a result, between April 19 and May 31, 2018, nearly 2,000 children were separated from their families and detained.  *Id.* ¶¶ 33-34.  Photos soon emerged of children locked in metal cages at the U.S. Customs and Border Patrol (CBP) facilities in Clint and McAllen, Texas.  *Id.* ¶ 35.  Public outrage followed, united as the Families Belong Together movement.  *Id.* ¶¶ 36-41.  CoreCivic, which manages various correction and detention facilities across the country, does not and has never operated any immigrant detention facilities for children separated from their parents under the Government's family separation policy.  *Id.* ¶¶ 7, 42-44.  It has no connection with the Clint and McAllen CBP facilities.

**C.      Defendants Exploit the Families Belong Together Movement and Publish False and Defamatory Statements and Implications About CoreCivic to Drive Business (Investments) Away From CoreCivic and to Themselves.**

For Defendants, the Families Belong Together movement provided an unprecedented business opportunity.  *Id.* ¶¶ 46-57.  Defendants realized they could exploit the movement for financial gain by misdirecting public outrage over family separation to redirect investors' and potential investors' capital to their "socially conscious" investments.  *Id.* ¶ 46.  To maximize their returns, Defendants targeted CoreCivic, which has one of the largest market capitalizations in its industry—even though Defendants knew that it has never operated any immigrant detention facilities for children separated from their parents at the border.  *Id.* ¶¶ 42-45, 47, 58-68.

Defendants' campaign against CoreCivic was simple and effective.  After setting the stage

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

by falsely claiming that CoreCivic "manage[s] some of the detention centers that have been at the heart of the controversy over the separation of families" *id.* ¶ 48, Ex. A, Defendants published articles on the "Investing" section of Forbes.com questioning CoreCivic's financial viability and making false factual accusations about CoreCivic to fuel public and investor outrage.

Defendants published their first defamatory article, headlined "JPMorgan Chase Is Done with Private Prisons," on the "Investing" section of Forbes.com on March 5, 2019 (the "March 5 Article"). *Id.* ¶ 51, Ex. B. Defendants began the article by reporting JPMorgan's announcement that it would stop financing CoreCivic and then, to encourage readers to stop investing in CoreCivic, stated that JPMorgan's move "calls into question the financial viability of the private prison industry," which Defendants reported "has come under fire both by activists and financial analysts." *Id.* To foment outrage against CoreCivic, Defendants then directly connected it to the separation and detention of immigrant children by stating that "CoreCivic ha[s] a long history of profiting from mass incarceration," connecting various banks' withdrawals of funding from CoreCivic to the family separation policy and detention of immigrant children, and discussing "abuses" inside detention facilities "since news of family separation ... began"—falsely portraying CoreCivic as not only involved in family separation, but also responsible for those abuses. *Id.*

To further fuel outrage against CoreCivic among the investing public, Defendants then claimed that CoreCivic, to "profit[] from mass incarceration," "spent $25M on lobbying ... to push for harsher criminal justice and immigration laws"—to enrich itself by incarcerating immigrant children separated from their parents at the border. *Id.* ¶ 71, Ex. B. Defendants then described the Families Belong Together movement and its work to persuade banks to stop providing financing to CoreCivic. *Id.* at Ex. B. Defendants concluded their article by again presenting CoreCivic as financially nonviable and, immediately thereafter, hyperlinking to Defendants' website and social media promoting their investment management services. *Id.* ¶ 52, Ex. B. To maximize the audience for their March 5 Article, Simon published a "tweet" that linked to—and incorporated— the March 5 Article alongside the hashtag "#FamiliesBelongTogether" to ensure readers would further connect Defendants' claims about the detention of immigrant children with CoreCivic.

Defendants continued their campaign to pull investors away from CoreCivic and to

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

themselves by publishing another article on the "Investing" portion of Forbes.com on September 30, 2019, headlined "GEO Group Runs Out of Banks as 100% of Banking Partners Say 'No' to the Private Prison Sector" (the "September 30 Article"). *Id.* ¶ 51, Ex. C. The Article, like its predecessor, began by reporting numerous purported facts about CoreCivic to convey its supposed financial nonviability and encourage investors to divest from it, including statements that, following demands by the #FamiliesBelongTogether movement, "[m]ajor banks ... have [] committed to not renew $2.4B in credit lines and term loans to ... CoreCivic"; "Fitch downgraded CoreCivic from stable to negative"; "stock prices for [CoreCivic] are near historic lows"; "the one-year returns on investors for ... CoreCivic are down nearly 30%"; and there is "an estimated shortfall of 82.4% of all future funding to the [private prison] industry." *Id.* at Ex. C.

Defendants' September 30 Article—again to foment outrage toward CoreCivic and redirect capital away from it—provided "a brief historical recap" that repeated Defendants' claims that CoreCivic "spent $25M on lobbying ... to push for harsher criminal justice and immigration laws" to enrich itself by detaining children separated from their parents. *Id.* ¶ 72, Ex. C. Defendants then encouraged readers to end CoreCivic's supposed efforts to "funnel[] more detainees into their facilities" by closing their accounts with banks that finance CoreCivic. And to redirect those readers' investments to themselves, Defendants hyperlinked to their website and social media promoting their products and also linked to Candide's investing disclosures. *Id.*

As a direct result of Defendants' defamation, CoreCivic suffered significant harm, including millions of dollars in lost financing. *Id.* ¶¶ 57, 104-17 & n.14.

**D.      Defendants Published Their Defamatory Statements Despite Knowing They Are False—and Refuse to Retract Them.**

Defendants' accusations about CoreCivic are false. CoreCivic does not and has never operated immigrant detention facilities for children separated from their parents at the border. Compl. ¶¶ 7, 42-44. And CoreCivic "does not, under longstanding policy, lobby for or against any policies or legislation that would determine the basis for or duration of an individual's incarceration or detention." *Id.* ¶¶ 83-90. And Defendants knew their claims about CoreCivic are false, including from information they possessed from numerous sources. *Id.* ¶¶ 58-60, 66, 71-73, 80-90, 120-21,

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

135-36.

Moreover, Defendants refused to retract their defamatory statements and implications despite CoreCivic's demands that they do so—and in fact doubled-down on and republished them. On October 2, 2020, CoreCivic's counsel sent Defendants a detailed letter explaining that their March 5 and September 10 Articles and March 6 Tweet were false and defamatory and demanding their retraction. *Id.* ¶ 62, Ex. E. Defendants refused and instead, on October 10, 2019, doubled-down on and republished both articles with added "Clarifications" that, remarkably, admitted that Defendants knew that "the terminology of 'family separation'" employed in their articles "tends to focus on the detention of children," dismissed the truth as something "CoreCivic has stated," and added further false statements that, among other things, CoreCivic helped "write and promote legislation for mandatory minimum sentences, three strikes laws, and 'truth in sentencing' legislation." Compl. ¶¶ 55, 93-102, Exs. D, F. This action followed.

## LEGAL STANDARD

This Court engages in a two-part inquiry to resolve Defendants' Motion to Strike. Defendants first bear the burden of showing that Cal. Civ. Proc. Code § 425.16 applies. *Manzari v. Assoc. Newspapers Ltd.*, 830 F.3d 881, 887 (9th Cir. 2016). If Defendants make that showing, the Court looks at the merits of CoreCivic's claim. This "second step ... is often called the ***minimal merit prong***" because "[o]nly a cause of action that lacks even minimal merit constitutes a SLAPP." *Id.*[2] Where, as here, a defendant professes to challenge only the legal sufficiency of a claim, the Court "appl[ies] the [FRCP] 12(b)(6) standard." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018).

Under Rule 12(b)(6), the complaint must be construed liberally and the "'court must accept as true all facts alleged [therein] and draw all reasonable inferences in favor of the plaintiff.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). A plaintiff's claim need only be "plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)—***"a low standard,"*** *Shaver v. Operating Eng'rs Local 428 Pension Tr. Fund*, 332 F.3d 1198, 1203 (9th Cir. 2003). This "'does ***not*** impose a probability requirement,'" and "'a well-pleaded complaint may proceed even if it

---

[2] All emphases added unless otherwise noted.

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

1  strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very

2  remote and unlikely.'" *Twombly*, 550 U.S. at 556.  The court "cannot resolve" factual questions at

3  the pleadings stage or make "credibility determinations." *Newcal Indus., Inc. v. Ikon Office Sol.*,

4  513 F.3d 1038, 1055 (9th Cir. 2008); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

5  <u>**ARGUMENT**</u>

6  **I.    California Code Of Civil Procedure § 425.16 Cannot Apply In Federal Court.**

7        Defendants' Motion to Strike fails because Section 425.16 cannot apply in federal court—

8  as confirmed by numerous recent, well-reasoned Circuit Court decisions that would cause the Ninth

9  Circuit to revisit its pre-*Shady Grove*[3] holding if presented the question today.  *E.g.*, *La Liberte v.*

10  *Reid*, 966 F.3d 79, 86-88 (2d Cir. 2020); *Klocke v. Watson*, 936 F.3d 240, 244-49 (5th Cir. 2019);

11  *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1349-57 (11th Cir. 2018); *Abbas v. Foreign*

12  *Policy Grp., LLC*, 783 F.3d 1328, 1333-37 (D.C. Cir. 2015) (Kavanaugh, J.).

13        As these courts have explained, Section 425.16 (and similar state statutes) "answer[s] the

14  same question as" Federal Rules 12 and 56, but "requires [a] plaintiff to make a showing that the

15  Federal Rules do not require," and, thus, it cannot apply in federal court.  *E.g.*, *La Liberte*, 966 F.3d

16  at 87.  Section 425.16 "requires outright dismissal unless the plaintiff can '***establish[] a probability***

17  that he or she will prevail on the claim,'" and thereby "establishes the circumstances under which

18  a court must dismiss a plaintiff's claim before trial." *Id.* (quoting Cal. Code Civ. P. § 425.16(b)(3)).

19  But under Rule 12(b)(6), a plaintiff need only "allege 'enough facts to state a claim to relief that is

20  ***plausible*** on its face'"—a standard that "'***does not impose a probability requirement at the***

21  ***pleading stage***.'"  *La Liberte*, 966 F.3d at 87.  Section 425.16 "'abrogates that [standard] ... by

22  requiring the plaintiff to establish that success is not merely plausible but probable.'"  *Id.*  And it

23  further conflicts with Rule 56 because it "nullifies" the plaintiff's entitlement under Rule 56 to

24  "proceed to trial by identifying any genuine dispute of material fact" by instead "'requiring the

25  plaintiff to prove that it is likely, and not merely possible, that a reasonable jury would find in his

26  favor.'"  *Id.*  In sum, "[t]ogether, Rules 12 and 56 express with 'unmistakable clarity' that proof of

27  _____

[3] In *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398-99 (2010), the
28  Supreme Court held that federal courts may not apply state law or rules if a valid Federal Rule of
Civil Procedure "answer[s] the same question" as the state law or rule.

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

1    probability of success on the merits is not required in federal courts to avoid pretrial dismissal." *Id.*

2    The Ninth Circuit's decision holding Section 425.16 applicable in federal court in *United*

3    *States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999), was issued

4    a decade before *Shady Grove* and is squarely abrogated by it—as many Ninth Circuit judges have

5    recognized.  *See Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1188 (9th Cir. 2013) (Watford, J.,

6    Kozinski C.J., Paez, J. and Bea, J. dissenting from denial of rehearing *en banc*).[4]  Moreover, the

7    Ninth Circuit's tortured effort to harmonize Section 425.16 with Rules 12 and 56 by construing it

8    to apply either a Rule 12(b)(6) or Rule 56 standard (depending on whether a defendant challenges

9    the legal or factual sufficiency of a claim), *Planned Parenthood*, 890 F.3d at 834, cannot avoid

10   conflict with the Federal Rules.  It is a "bedrock separation-of-powers principle that courts may not

11   unilaterally rewrite statutes," *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1824 (2020), especially state

12   statutes, *Wyoming v. Oklahoma*, 502 U.S. 437, 460 (1992), even to avoid constitutional issues,

13   *Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018); *see also State Dep't of Pub. Health v. Superior*

14   *Court*, 60 Cal. 4th 940, 956 (2015) ("[T]he requirement that courts harmonize potentially

15   inconsistent statutes when possible is not a license to redraft the statutes to strike a compromise

16   that the Legislature did not reach."); *Vasquez v. State*, 45 Cal. 4th 243, 253 (2008).

17   **II.    Section 425.16 Does Not Apply Here Because Defendants' Challenged Speech Falls Squarely Within The Anti-SLAPP Act's Commercial Speech Exemption.**

18   Defendants' Motion to Strike likewise fails because Defendants' speech at issue—

19   published in articles on the "investing" section of Forbes.com (and a promotional tweet)—falls

20   squarely within the Anti-SLAPP Act's "commercial speech" exemption. Section 425.17(c), enacted

21   in response to "a disturbing abuse of [the Anti-SLAPP Act]" exempts from its coverage "any cause

22   of action" (1) "against a person primarily engaged in the business of selling ... goods or services,

23   including ... financial instruments," based on any statements by that person that (2) "consist[] of

24   representations of fact about that person's business *or* a competitor's business operations, goods or

25   services," (3) are "made for the purpose of ... promoting[] or securing sales ... of, or commercial

26   transactions in, the person's goods or services," and (4) "the intended audience [of the statements]

27

28   [4] The only other Circuit to hold an anti-SLAPP statute applicable in federal court likewise did so without considering *Shady Grove*.  *See Godin v. Schencks*, 629 F.3d 79, 86-87 (1st Cir. 2010).

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer." Cal. Civ. Proc. Code § 425.17(c). Notably, for the commercial speech exemption to apply, the speech need ***not*** be "purely commercial," *JAMS, Inc. v. Superior Court*, 1 Cal. App. 5th 984, 997 (2016),[5] and a person "may not 'immunize' their false or misleading commercial speech by connecting it to public discussions," *Grasshopper House, LLC v. Clean & Sober Media, LLC*, No. 18-cv-923, 2018 WL 6118440, at *12 (C.D. Cal. July 18, 2018) (citing *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 966 (2002)). "Whether or not the [commercial speech] may be used for other purposes does not change the analysis." *JAMS*, 1 Cal. App. 5th at 998. Defendants' defamatory statements fall squarely within the commercial speech exemption.

***First***, Defendants—a financial advisor and for-profit investment firm who sell and promote "'socially conscious' investments" to "differentiate [themselves] from a flooded field of investment advisors," Compl. ¶¶ 8-9, 13-22—are "primarily engaged in the business of selling ... goods or services, including ... financial instruments." Indeed, "Simon describes herself as an 'investor' first" in Defendants' articles, which they publish to "expand their ... client base." *Id.* ¶ 24.

***Second***, Defendants published their defamatory statements and implications as part of purported "representations of fact about ... a competitor's business operations, goods or services" and Defendants' own goods and services. As investment professionals, Defendants compete with institutions that provide investment services, including banks, and Defendants distinguish their investment services in their articles by explaining that whereas banks have long had "ties with the private prison and immigrant detention industry," Defendants promote #FamiliesBelongTogether and divestment from that industry in favor of "socially conscious" investments. Defendants do so by reporting numerous purported facts about CoreCivic to convey its supposed financial nonviability and encourage investors to divest from it. *E.g.*, Compl. ¶¶ 14, 17, Ex. C, G. And it is those purported "representations of fact" supposedly showing the financial non-viability of

---

[5] Although one Court of Appeal District stated otherwise in sometimes-repeated *dicta* in *Taheri Law Grp. v. Evans*, 160 Cal. App. 4th 482 (2008), *Taheri* has since been rejected and roundly criticized. *E.g.*, *JAMS*, 1 Cal. App. 5th at 997; *Effron v. Am. Int'l Grp., Inc.*, No. B198461, 2008 WL 5413647, at *5 (Cal. Ct. App. Dec. 31, 2008) ("We are a bit puzzled by [*Taheri*'s] analysis[.]"); *ReMetrix LLC v. Ruch*, No. A130311, 2012 WL 2704926, at *7 (Cal. Ct. App. July 9, 2012).

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

CoreCivic—including assertions that CoreCivic "lobb[ies] ... for harsher criminal justice and immigration laws" so that it can "operate[] immigrant detention facilities for children separated from their parents at the [U.S.] border"—that defame CoreCivic. *Id.* ¶¶ 46, 64, 120-21, 135-36.

**Third**, Defendants published their defamatory accusations "for the purpose of ... promoting[] or securing sales ... of, or commercial transactions in, [its] goods or services." *Id.* ¶ 24. That well-pled fact is not conclusory, and it may be inferred from Defendants' articles. To begin, Defendants had an obvious economic incentive to publish articles disparaging CoreCivic and investments in it—to drive investors and potential investors away from CoreCivic and to Defendants' "socially conscious" investments—and courts recognize that jurors may infer that an article is published to "promot[e] ... sales" in a defendant's services where the defendant has an "economic incentive" to publish it. *Grasshopper*, 2018 WL 6118440, at *12. Indeed, where, as here, a defendant's publication could cause a decrease in the sales of another company's goods, "it is reasonable to infer that one of [defendant's] purposes in [publishing it] was to secure sales of [defendant's] own goods," *Nousvo, Inc. v. Nguyen*, No. 11-cv-10287, 2012 WL 13012649, at *4 (C.D. Cal. July 26, 2012). A purpose of promoting a defendant's own services may also be inferred where a publication "provides [the defendants'] contact information," including "a website URL for viewers to learn more ... about [the defendant's] products." *Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC*, 814 F. Supp. 2d 1033, 1038 (S.D. Cal. 2011). Defendants did that here by linking to Simon's website and social media promoting and providing information about Defendants' investment services. Compl. ¶¶ 24-25, 52-54, Exs. A-D, G.

**Fourth**, it is reasonable to infer that "the intended audience [of Defendants' publications] [was] an actual or potential ... customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential ... customer." Defendants published their articles on Forbes.com's "Investing" section, which touts its readers and target audience as "high-net-worth investors & consumers," "business owners," and "business ... decision makers," among others[6]—*i.e.*, potential investors: potential customers for Defendants. This element is satisfied by posts in publications

[6] Forbes, *The Forbes Consumer*, https://www.forbes.com/connect/audience.

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

targeting specific market segments—like Forbes' readers.  *See Weiland*, 814 F. Supp. 2d at 1038.

*Finally*, Section 425.17(d)'s limited media exceptions to the commercial speech exemption are inapplicable.  Section 425.17(d)(1) only "protects individual journalists—like [] publishers, editors, and reporters—from being sued in the course of their work," *Grasshopper*, 2018 WL 6118440, at *13, but Defendants are an investor and investment firm; Simon does not even claim to be a journalist, and this section is not applicable to business entities like Candide, *see id.* Likewise, Section 425.17(d)(2) only potentially applies to "article[s] published in ***a newspaper or magazine*** of general circulation" but Defendants published their articles only on Forbes.com (and Twitter), not in Forbes magazine or a newspaper.  And Forbes.com is not a "newspaper or magazine" for purposes of this section.  "It is well established that, when the statutory language is plain, [courts] must enforce it according to its terms." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009); *Martinez v. Combs*, 49 Cal. 4th 35, 51 (2010) ("[W]e presume the Legislature meant what it said, and the statute's plain meaning governs."); *see also Price v. Time, Inc.*, 416 F.3d 1327, 1336 (11th Cir.), *as modified*, 425 F.3d 1292 (11th Cir. 2005) (refusing to interpret "newspaper" to mean "magazine" or any publication other than a "newspaper").  Section 425.17 was drafted and enacted in 2003, in the Internet era, and the Legislature could have included "internet websites" alongside "newspaper or magazine" if it had intended to include them, but it did not do so.

## III.   CoreCivic More Than Adequately Pleads Its Defamation Claims.

### A.   Defendants' Statute-of-Limitations Argument Fails; Defendants Republished Their Defamatory September 2018 Article in Their March 5, 2019 Article (and Republished Their March 5 Article in Their March 6 Tweet).

Defendants' argument that CoreCivic's defamation claims are time-barred to the extent they are based on Defendants' September 25, 2018 article fails because CoreCivic does ***not*** base its defamation claims—even in part—on Defendants' original publication of that article.  Rather, CoreCivic bases ***part*** of its defamation claims on Defendants' ***re***publication of that article within the limitations period:  Under settled law, Defendants republished their defamatory September 2018 article when they published a hyperlink to it in their March 5, 2019 article alongside additional defamatory content, and by further directing a new audience to their September 2018 article.

Although California follows the "single-publication rule," that rule does not apply and "the

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

statute of limitations is reset when a statement is republished," *Yeager v. Bowlin*, 693 F.3d 1076, 1082 (9th Cir. 2012), because "each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises," *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 n.3 (1984). Thus, "if the same defamatory statement is published in the morning and evening editions of a newspaper, each edition is a separate single publication and there are two causes of action." Restatement (Second) of Torts § 577A cmt. d.[7]  This rule fully applies to internet publications.

Under California law, a statement on a website is republished if it is "substantively altered or added to **or** the website is directed to a new audience." *Yeager*, 693 F.3d at 1082; *Hebrew Acad. of S.F. v. Goldman*, 42 Cal. 4th 883, 891 (2007).  Contrary to Defendants' assertion, an internet publication may be republished by posting a hyperlink to it in a subsequent publication because a hyperlink to one publication in another publication incorporates the former into the latter.  *E.g.*, *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 958 (N.D. Cal. 2015); *Rosado v. eBay Inc.*, 53 F. Supp. 3d 1256, 1260 n.1 (N.D. Cal. 2014).[8]  When someone publishes a hyperlink to a previous publication in a new publication, she republishes the prior publication if she "substantively ... add[s] to" it **or** "direct[s] [it] to a new audience."  *See Yeager*, 693 F.3d at 1082; *Hebrew Acad.*, 42 Cal. 4th at 891; *Enigma Software Grp. USA v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 278 (S.D.N.Y. 2016) (hyperlink republishes linked article if published alongside additional related content).  Defendants' caselaw does not hold otherwise; rather, it simply recognizes that "providing links to statements already published on the Web, ***without more***" may not republish the linked statements.  *See Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02-cv-2258, 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007); *Clark v. Viacom Int'l, Inc.*, 617 F. App'x 495, 506 (6th Cir. 2015) ("run-of-the-mill hyperlinks").  Thus, Defendants' caselaw simply recognizes that California's settled republication rule applies to internet publications connected by hyperlinks.  And notably, the question of republication, like the question of publication, ***is a question of fact***,

---

[7] *See also Shively v. Bozanich*, 31 Cal. 4th 1230, 1243 (2003) (applying Restatement Section 577A).
[8] *See also Adelson v. Harris*, 973 F. Supp. 2d 467, 483-84 (S.D.N.Y. 2013) ("[P]ersons navigating the Internet understand hyperlinks as means of connecting one webpage to another" such that "clicking [a] hyperlinked phrase is the [21st] century equivalent of turning over [a] cruise ticket.").

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

especially in the internet context. *E.g.*, *McKinney v. Cty. of Santa Clara*, 110 Cal. App. 3d 787, 798 (1980); *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 880 (W.D. Va. 2016) ("'The question of whether an Internet republication has occurred is highly factual[.]'").[9]

Defendants republished their September 2018 article by hyperlinking to it in their March 5 Article by "substantively ... add[ing] to" it and, separately, by "direct[ing] [it] to a new audience."

Defendants' September 2018 article, like their later articles, falsely accused CoreCivic of operating immigrant detention facilities for children separated from their parents, profiting from their detention, and being responsible for abuses in facilities detaining them. *E.g.*, Compl. ¶¶ 48, 66, 120-21, 135-36, Ex. A. Defendants did so by, among other things, falsely asserting that "CoreCivic ... manag[es] some of the detention centers that have been at the heart of the controversy over the separation of families ... [at] the US border," writing about "the role of CoreCivic ... profiting off the ... separation of families," and connecting CoreCivic to "verbal, physical and sexual abuse of migrant children within detention facilities." *Id.* The article further connected CoreCivic to the detention of separated children by emphasizing that the focus of the family separation controversy is "[i]ncarcerating children." *Id.* ¶¶ 64-66, Ex. A.

Then, on March 5, 2019, Defendants republished their September 2018 article by publishing a hyperlink to it in their March 5 Article and "add[ing] to" its defamatory statements and implications. *See Yeager*, 693 F.3d at 1082; *Hebrew Acad.*, 42 Cal. 4th at 891; *Enigma Software*, 94 F. Supp. 3d at 278. Defendants did so by not simply publishing that hyperlink in isolation "without more," as in the cases Defendants cite, but rather by publishing it alongside additional statements and implications reiterating and "add[ing] to" it with additional false accusations that CoreCivic operates immigration detention facilities for children separated from their parents at the border, profits from that detention, and is responsible for "abuses" in those facilities. Compl. ¶¶ 51, 120-21, 135-36, Ex. B. That is textbook republication under California law.

Defendants also republished their September 2018 article for the separate reason that, in publishing a hyperlink to it, they "direct[ed] [it] to a new audience." *See Yeager*, 693 F.3d at 1082;

---

[9] *See also Etheredge-Brown v. Am. Media, Inc.*, 13 F. Supp. 3d 303, 307 n.2 (S.D.N.Y. 2014); *Wiswell v. VerticalScope, Inc.*, No. 11-cv-737, 2012 WL 13136295, at *4 (W.D. Tex. Aug. 1, 2012).

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

NEWMEYER
DILLION

*Hebrew Acad.*, 42 Cal. 4th at 891.  Again, Defendants did not simply publish their hyperlink to their September 2108 article in isolation "without more."  Rather, Defendants prominently featured that hyperlink early in their March 5 Article and immediately thereafter falsely claimed that CoreCivic has "lobbi[ed] ... for harsher criminal justice and immigration laws" to enrich itself by detaining children separated from their parents, and invited readers to learn more by clicking on the hyperlink to their September 2018 article, which they explain "explored" that purported fact in greater depth.  Compl. at Ex. D.  In so doing, Defendants intended to and did direct their September 2018 article to a new audience—readers of their March 5 Article.  *Id.* ¶¶ 67, 120-21, 135-36.[10]

For the same reasons, Defendants republished their March 5 Article in their March 6 Tweet. In that tweet—which was intended to promote their March 5 Article—Defendants directed new and additional readers to their March 5 Article by publishing a hyperlink to it for all viewers of the tweet "ICYMI [in case you missed it]," and, separately, by accompanying that link with additional content, including the hashtag "#FamiliesBelongTogether," to ensure readers would connect the tweet with Defendants' article accusing CoreCivic of detaining immigrant children separated from their parents pursuant to the Government's family separation policy.  *Id.* ¶¶ 54, 67, 120-21, 135-36.  For the same reasons, Defendants republished their March 5 and September 30 Articles when they added "Clarifications" to them doubling-downing on the defamatory accusations in those articles.  *Eramo*, 209 F. Supp. 3d 879-80.  At minimum, a fact question as to republication remains.

**B.    CoreCivic More Than Adequately Pleads That Defendants' Defamatory Family Separation Statements and Implications Are False.**

Contrary to Defendants' assertions, CoreCivic more than adequately pled that Defendants' defamatory statements and implications that CoreCivic "operates immigrant detention facilities for children separated from their parents at the [U.S.] border" *id.* ¶¶ 46, 64, 120-21, 135-36 are false. And although Defendants do not acknowledge it, CoreCivic's burden in satisfying this element is

---

[10] Even if Defendants' September 2018 article were not republished (and it was), it is still relevant because it provides context for Defendants' assertions in their March and September 2019 articles. "In considering a claim for libel, a court examines the totality of the circumstances, including the context in which the statement was made," *Med. Marijuana, Inc. v. ProjectCBD.com*, 46 Cal. App. 5th 869, 888 (2020), and that context includes Defendants' other statements and publications relating to the same subject, *e.g.*, *Sanders v. Walsh*, 219 Cal. App. 4th 855, 863 (2013); *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 330 n.4 (4th Cir. 2005).

minimal.  At the Rule 12(b)(6) stage, "the court must of course credit the plaintiff's allegation of the factual falsity of a statement" unless contradicted by documents incorporated in the complaint, *e.g.*, *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993), and the truth or falsity "of a statement is a question of fact for the jury," *Aurora World, Inc. v. Ty Inc.*, No. 09-cv-8463, 2011 WL 13175457, at *10 (C.D. Cal. Mar. 14, 2011) (collecting cases); *Hughes v. Hughes*, 122 Cal. App. 4th 931, 936-37 (2004) (same).

Defendants do not dispute that CoreCivic does not and has never operated any immigration detention facilities for children separated from their parents under the Government's family separation policy.  Compl. ¶¶ 7, 42-44.  Nor could they.  Instead, Defendants argue that their statements and implications are not false because they do not convey that meaning.  Defendants assert that their statements just "generally link CoreCivic to a broader movement against private prison operators [and] to an overall criticism of incarcerating immigrants and separating families." Mot. 11.  Then, based on that proffered interpretation, Defendants contend that their statements and implications are not false because CoreCivic, in its Complaint, did not specifically "deny it detains immigrant adults separated from their families."  *Id.* at 12.

Defendants' argument fails.  To begin, although Defendants do not acknowledge it, to prevail on their argument, their proffered interpretation of their statements and implications would have to be the ***only*** possible interpretation, because when a statement or implication is reasonably susceptible to multiple meanings, "it is for the jury to determine" what meaning "was in fact conveyed to the ... reader." *Bently Reserve LP v. Papaliolios*, 218 Cal. App. 4th 418, 428 (2013); *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998).  Here, CoreCivic pleads *facts* that Defendants' "family separation statements" "falsely convey[ed] [to readers] that CoreCivic operates immigrant detention facilities for children separated from their parents at the border."  Compl. ¶¶ 121, 136.  Moreover, CoreCivic pled that Defendants expressly admitted exactly that: In their purported "Clarification" of their March 5 Article, Defendants expressly acknowledged that "***the terminology of 'family separation' tends to focus on the detention of children***."  Compl. ¶ 55, Ex. D.  In other words, Defendants have admitted that their claims about CoreCivic's involvement in "family separation" may reasonably be understood as conveying that

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

1    CoreCivic is involved in "the detention of children" separated from their families.  *See id.*  It is

2    irrelevant that Defendants claim to "view" the issue of family separation differently.  A statement's

3    truth or falsity "may depend upon how the statement is understood," and when a false meaning is

4    possible, "it [i]s for the jury to determine if that is how the statement should be understood."

5    *Hughes*, 122 Cal. App. 4th at 937.  At bottom, Defendants ask the Court to disregard CoreCivic's

6    well-pled facts and draw inferences against CoreCivic and in their favor, which, at the pleadings

7    stage, the Court may not do.  *See Khoja*, 899 F.3d at 1003.

8          Defendants' argument that its implications that CoreCivic operates immigrant detention

9    facilities for children separated from their parents under the Government's family separation policy

10   (as opposed to its direct statements) are not false likewise fails.  Defendants knock down a straw

11   man by arguing that their articles cannot convey that CoreCivic "was specifically responsible for

12   the 'children in cages' at the border."  Mot. 12.  The relevant implication is that CoreCivic operated

13   facilities that detained children separated from their parents at all.  And Defendants concede that

14   "the terminology of 'family separation' tends to focus on the detention of children."  Compl. ¶ 55,

15   Ex. D.  In any event, it is not an untenable leap from the detention of children separated from their

16   parents to the images of kids in cages that are among "the abuses inside [] private [detention]

17   facilities" that followed "news of family separation" that Defendants discuss.  *Id.* at Ex. B.

18       **C.**    **Defendants' Defamatory Statements Are Not Non-Actionable Opinion.**

19          Defendants' argument that their defamatory statements and implications are "non-

20   actionable opinion," Mot. 14-16, likewise fails.  To begin, there is no "wholesale defamation

21   exemption for anything that might be labeled 'opinion,'" because "expressions of 'opinion' may

22   often imply an assertion of objective fact."  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-21

23   (1990); *Rodriguez v. Panayiotou*, 314 F.3d 979, 986 (9th Cir. 2002) (same).  Rather, the pertinent

24   question is "whether a reasonable factfinder could conclude that the statement 'impl[ies] an

25   assertion of objective fact.'"  *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990).  The

26   Ninth Circuit employs a three-part test for analyzing whether a statement can imply an assertion of

27   fact: (1) whether the work's general tenor negates the impression that the statement is an objective

28   fact; (2) whether the defendant used figurative or hyperbolic language; and (3) whether the

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

statement is susceptible of being proven true or false. *Id.* Defendants cannot satisfy *any* factor.

*First*, the general tenor of Defendants' publications is factual and historical. Defendants' publications are articles published on the "Investing" section of Forbes' news website, not "op-eds" or "opinion pieces." Compl. at Ex. D ("This ***article***...."); Ex. G ("Following the release of this ***article***...."). Moreover, Defendants' articles—written in the third-person objective tense—purport to report matters of fact, as even evident from their headlines, which report on the cessation of certain financing to CoreCivic. Indeed, Defendants even include their defamatory statements in "a brief historical recap." *Id.* at Ex. C. Defendants' articles contrast markedly with the publications in the cases they cite: a "newspaper opinion column" rife with hyperbolic language, Mot. 13 (citing *Cochran*), an opinion segment on political firebrand Rachel Maddow's show, Mot. 14 (citing *Herring Network*), and a book whose purpose was to offer a dramatized, first-person, "personal viewpoint," Mot. 13 (citing *Partington*). The fact that the subject of Defendants' reports may be politically charged does not change the factual nature of their reporting.[11]

*Second*, unlike the publications in the cases on which Defendants rely, Defendants' publications are altogether devoid of hyperbolic or figurative language. Rather, Defendants' articles are written in an informative, reporting, and factual tone. Indeed, the only "figurative concept" Defendants attempt to identify in their Motion is a reference to a "general uproar over the Trump family separation policy," Mot. 14, but Defendants' articles do not even use that terminology.

*Third*, Defendants' defamatory statements and implications are capable of being proven true or false. Defendants' accusation that CoreCivic operates immigrant detention facilities for children separated from their parents under the Government's family separation policy purports to convey clear-cut, (dis)provable facts. Either CoreCivic does that or it does not. That is a provable question of fact. The same is true of Defendants' statements used to support that accusation. Defendants—who acknowledge that "the terminology of 'family separation' tends to focus on the detention of children," Compl. ¶ 55, Ex. D—wrote that "CoreCivic ... manag[ed] some of the

---

[11] Although Defendants are members of "the corporate accountability committee targeting big banks through both insider conversations and consumer-facing strategies," the articles do not recount their personal experiences on that committee or "insider conversations" with banks.

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

detention centers that have been at the heart of the controversy over the separation of families and incarceration of individuals for crossing the US border", *id.* ¶ 120(b).  Either CoreCivic did or did not manage those facilities.[12]  (It did not. Compl. ¶¶ 7, 42-44.)  After identifying CoreCivic as one of the two largest operators of private detention facilities, Defendants claim that there have been "abuses inside [the] private facilities" featured in "news of family separation at the southern border." *Id.* ¶ 120(a). This likewise conveys (dis)provable facts.  Either the abuses featured in news of family separation at the border were in facilities operated by CoreCivic, or they were not.  (They were not.  *Id.* ¶¶ 35-45.)[13]  Moreover, ***Defendants know their "family separation" statements and implications are capable of being proven true or false—because Defendants argue that they are, in fact, true***.  Mot. 11-13.

Defendants' accusations about CoreCivic's lobbying activities are likewise capable of being proven true or false.  CoreCivic either did or did not "spen[d] $25M on lobbying over the past three decades to push for harsher criminal justice and immigration laws" to enrich itself by incarcerating immigrant children separated from their parents at the border.  Did CoreCivic spend $25 million lobbying for criminal justice and immigration laws to increase penalties?  Did CoreCivic do so to enrich itself?  Did CoreCivic do so even though those laws would result in the separation of criminally non-culpable[14] children from their parents?  These are all issues capable of being proven true or false.  *E.g.*, *Borg v. Boas*, 231 F.2d 788, 793 (9th Cir. 1956) ("[T]he imputation of a corrupt motive is often treated as a statement of fact.").  Indeed, ***Defendants admit that their statements and implications about CoreCivic's lobbying activities contain "factual assertions"***—but remarkably ask this Court to insulate them from defamation liability because, they assert, they relied on "disclosed news sources" to support their claims.  Mot. 16.  Not only does the question of Defendants' purported reliance present a fact issue that impermissibly contradicts CoreCivic's

---

[12] Defendants' description of certain facilities as facilities "at the heart of [a] controversy" does not change the verifiable factual question whether CoreCivic operated those facilities.

[13] That Defendants' defamatory accusations convey (dis)provable facts is not changed by Defendants' irrelevant assertions about *other* words used in *other* places in their articles—such as their characterization of banks as "enable[rs]" of private prisons. Mot. 14-15.

[14] *See* Cal. Welf. & Inst. Code § 602.1 (children under age 12 who commit all but certain crimes released to guardians; others subject to juvenile court jurisdiction); Cal. Penal Code § 26 (children under age 14 incapable of committing crimes absent "clear proof" of knowledge of wrongfulness).

1    well-pled facts, Compl. ¶¶ 81-82, but even if Defendants' claims are based on another speaker's

2    false factual assertions, that does not render Defendants' accusations incapable of being proven true

3    or false.  *See Flowers v. Carville*, 310 F.3d 1118, 1129 (9th Cir. 2002) ("[A] defamatory statement

4    isn't rendered nondefamatory merely because it relies on another defamatory statement.").

5        **D.    Defendants' False Claims That CoreCivic Lobbies for Harsher Criminal and
            Immigration Laws Are Capable of Having a Defamatory Meaning.**

6        Next, Defendants contend that their accusation that CoreCivic has spent $25 million

7    "lobbying ... for harsher criminal justice and immigration laws" to enrich itself by separating

8    children from their parents at the border is incapable of having a defamatory meaning.  In other

9    words, Defendants contend that that accusation is incapable of "exposing [CoreCivic] to hatred,

10   contempt, ridicule, or obloquy," *or* "caus[ing] [CoreCivic] to be shunned or avoided," *or* "tend[ing]

11   to injure [CoreCivic] in [its] [business]."  Cal. Civ. Code § 45.  Defendants do so despite reporting

12   in their defamatory articles that banks have stopped providing services to (*i.e.*, are avoiding)

13   CoreCivic and that ten million people have banded together in the #FamiliesBelongTogether

14   movement to express hatred, contempt, and outrage at CoreCivic for that very reason.

15       To begin, contrary to Defendants' claim, CoreCivic ***did*** plead special damages in its

16   Complaint—including the loss of specific financing as a result of Defendants' defamatory

17   publications that has cost CoreCivic millions per year.  Compl. ¶¶ 57, 116, Ex. C.  Thus, CoreCivic

18   need only plead that Defendants' publications are defamatory, not defamatory "on their face" (*per

19   se*).  To plead that Defendants' publications are defamatory, CoreCivic need not show that they

20   "exposed [CoreCivic] to hatred, contempt," and so forth in the eyes of *everyone* as Defendants

21   suggest; rather, "it is enough that the [publications] would tend to prejudice [CoreCivic] in the eyes

22   of a substantial and respectable minority of [readers]."  Restatement (Second) of Torts § 559 cmt.

23   e; *accord Aversa v. United States*, 99 F.3d 1200, 1206 (1st Cir. 1996); *White v. Fraternal Order of

24   Police*, 909 F.2d 512, 518 (D.C. Cir. 1990); 1 Rodney Smolla, Law of Defamation § 4:4.

25       Defendants also misstate the context in which their defamatory accusations must be viewed,

26   as well as CoreCivic's well-pled facts, both of which confirm that Defendants' so-called "lobbying

27   statements" are capable of having a defamatory meaning.  Contrary to Defendants' assertion, their

28

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
                  3:20-CV-03792-WHA

NEWMEYER
DILLION

1   "lobbying statements" do not simply assert that CoreCivic advocated a policy position or assert, in

2   a vacuum, that CoreCivic lobbied for harsher criminal and immigration laws.  Defendants' made

3   their false claims that CoreCivic has spent millions "lobbying ... for harsher criminal justice and

4   immigration laws" in the context of articles reporting on immigrant children being separated from

5   their families and abused inside facilities featured in news of family separation at the border.  And

6   they made those false claims about CoreCivic's lobbying while claiming that CoreCivic's business

7   model depends on detaining as many people as possible, "justly *or unjustly*."  Compl. at Ex. B.

8        Viewed in context as they must be, *Med. Marijuana*, 46 Cal. App. 5th at 888, Defendants'

9   so-called "lobbying statements" can reasonably—and easily—be understood as not simply

10  claiming that CoreCivic lobbied for some governmental policy, but rather lobbied for harsher

11  criminal justice and immigration laws *for the purpose of* enriching itself by detaining children

12  separated from their parents under the Government's family separation policy.  Such claims are

13  more than capable of "exposing [CoreCivic] to hatred, contempt, ridicule, or obloquy," *or*

14  "caus[ing] [CoreCivic] to be shunned or avoided," *or* "tend[ing] to injure [CoreCivic] in [its]

15  [business]," as confirmed by Defendants' own reporting that numerous banks have stopped doing

16  business with CoreCivic and countless people are calling for its defunding because of its purported

17  efforts to incarcerate children separated from their parents at the border.

18       Defendants cannot avoid that conclusion by asserting that CoreCivic is simply lobbying in

19  support of a business model that monetizes the "indefinite detention of immigrants," Mot. 17, which

20  contradicts CoreCivic's well-pled facts that it does not lobby for harsher sentencing or immigration

21  laws but aims to—and lobbies for criminal justice reforms that would—"reduce recidivism and

22  incarceration rates by helping people successfully reenter society upon their release."  Compl. ¶¶ 3,

23  7, 76-77.   Indeed, by falsely accusing CoreCivic of acting contrary to its numerous public

24  representations that it works to "reduce recidivism and incarceration rates by helping people

25  successfully reenter society upon their release" *id.*, Defendants accuse CoreCivic of actively lying

26  and misrepresenting its actions to the public, and thereby defame CoreCivic in an additional way.

27  *E.g.*, *Sundance Image Tech., Inc. v. Inkjetmall.com, Ltd.*, No. 02-cv-2258, 2006 WL 8455346, at

28  *3 (S.D. Cal. June 9, 2006).  At bottom, Defendants' argument is just silly—their business model

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

NEWMEYER
DILLION

certainly is not based on the notion that CoreCivic should be lauded and praised. At its core, it is premised on subjecting CoreCivic to ridicule, contempt, hatred, and to encourage the investing public to shunned and avoid the company. The Court should reject Defendants' suggestion that their statements do not have the very meaning they were designed to have.

### E. CoreCivic's Complaint Pleads More Than Sufficient Facts To Plausibly Allege That Defendants' Published Their Defamatory Statements With Actual Malice.

CoreCivic's Complaint pleads numerous facts demonstrating that Defendants knew or recklessly disregarded that their defamatory statements and implications are false.

#### 1. The Actual Malice Standard Is Not Prohibitive, Especially at the Pleadings Stage.

As an initial matter, although the Supreme Court has stated that the "actual malice" standard is rooted in the First Amendment, it is not an insurmountable hurdle—especially at the pleadings stage. CoreCivic need only plead facts giving rise to a plausible inference of actual malice. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 814-15 (2d Cir. 2019); *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ("'Malice may be proved inferentially[.]'"); *Ornelas v. City of Pomona*, No. 09-cv-637, 2010 WL 11597412, at *3 (C.D. Cal. Apr. 15, 2010).

Importantly, the factual allegations in CoreCivic's Complaint must be viewed in the context of what courts—including the U.S. Supreme Court—have held constitute evidence of actual malice. Because defamation-defendants "are prone to assert their good-faith belief in the truth of their publications" such that "plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself," *Herbert v. Lando*, 441 U.S. 153, 170 (1979), plaintiffs are "entitled to prove the defendant's state of mind through circumstantial evidence," *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *Harris v. City of Seattle*, 152 F. App'x 565, 567-68 (9th Cir. 2005); *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1087 (9th Cir. 2002).[15]

In evaluating the sufficiency of such circumstantial evidence—or, here, factual allegations at the pleading stage—courts must take a holistic approach that examines the "totality" of the allegations to determine whether, collectively, they are capable of giving rise to an inference of

---

[15] *See also, e.g.*, *Palin*, 940 F.3d at 815; *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1090 (3d Cir. 1988); *Eramo*, 209 F. Supp. 3d at 871.

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

knowledge of falsity or reckless disregard for the truth. *Celle*, 209 F.3d at 183; *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1256 (9th Cir. 1997); *Tavoulareas v. Piro*, 817 F.2d 762, 794 n.43 (D.C. Cir. 1987) (rejecting the piece-by-piece approach Defendants advocate because "each individual piece of evidence cannot fairly be judged individually"). As California courts recognize, "[e]vidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity." *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 709-10 (2007) (alterations omitted). Thus, for example, although bias may not alone be sufficient to demonstrate actual malice, "evidence concerning motive," "financial interest," or bias is a relevant evidentiary building block toward proving actual malice. *Connaughton*, 491 U.S. at 668; *Solano*, 292 F.3d at 1085; *Overstock.com*, 151 Cal. App. 4th at 711. Similarly, evidence that the defendant avoided knowledgeable sources of information about the subject of her defamatory accusations supports a finding of actual malice. *Connaughton*, 491 U.S. at 692.

Critically, as the U.S. Supreme Court has repeatedly admonished, because "proof of 'actual malice' calls a defendant's state of mind into question," where lack of fault is not clear, this element "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979); *Lawrence v. Bauer Publ'g & Printing Ltd.*, 459 U.S. 999, 1003-04 (1982); *accord St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("***The finder of fact*** must determine whether the publication was indeed made in good faith."); *Kaelin*, 162 F.3d at 1042 ("[S]tatements of [] subjective intention are ***matters of credibility for a jury***.").

### 2. CoreCivic's Complaint Pleads Facts Constituting Direct Evidence of Actual Malice—And Defendants' Requests to Disregard Those Well-Pled Facts Must Be Rejected.

To begin, CoreCivic pled that Defendants had actual "first-hand knowledge" that their defamatory statements and implications were false at the time they published them. Compl. ¶¶4, 60, 126, 141. And those allegations were not conclusory: CoreCivic's Complaint pled facts that, assumed true (as they must be), show ***how*** Defendants knew their defamatory statements were false.

***First***, CoreCivic pled multiple facts that, taken as true, show that Defendants knew their defamatory statements and implications that "CoreCivic operates immigrant detention facilities for

children separated from their parents at the [U.S.] border", *id.* ¶¶ 66, 120-21, 135-36, are false.  For example, CoreCivic pled that Defendants were "close[ly]" connected with "the protests of the immigrant detention facilities that house unaccompanied minors" and, as a result, "Defendants had firsthand knowledge that none of those facilities are operated by CoreCivic."  *Id.* ¶ 60.

Similarly, CoreCivic pled that Defendants—to generate revenue for their investment business that "differentiates itself in the investment firm industry" by pitching "socially-conscious" investments *id.* ¶ 17—"launched a comprehensive campaign ... to exploit the Families Belong Together movement ... to encourage investors, institutions, and banks to divest from CoreCivic and invest in products from which Defendants' profit."  *Id.* ¶ 48.  It is plausible to infer that Defendants, as part of that campaign, familiarized themselves with the "family separation policy" and where children separated from their parents at the border were detained—and learned that CoreCivic did not operate those facilities.  *See Palin*, 940 F.3d at 813-14 (Defendants' experience raised plausible inference of knowledge of issues relevant to that experience).

Moreover, CoreCivic pled that because "CoreCivic [is] one of Defendants' primary targets" as it works to redirect investments to those from which Defendants profit, "Defendants have visited and read CoreCivic's website, including [its] 'What We Do' section," which "states in bold print that '**CoreCivic never has and never will house unaccompanied minors.**'"  Compl. ¶¶ 58-59.

***Second***, CoreCivic pled multiple facts that, taken as true, show that Defendants knew their defamatory statements and implications that "CoreCivic has spent $25M on lobbying over the past three decades to push for harsher criminal justice and immigration laws" to enrich itself by detaining children separated from their parents, *id.* ¶¶ 71-73, 120-21, 135-36, are false.  For example, CoreCivic pled that "Defendants were aware of and read at least two articles that rebutted their false claims about CoreCivic's lobbying efforts"—articles that they even linked in their defamatory publications.  *Id.* ¶ 80.  "Defendants had read an NPR article stating that CoreCivic ... had no role in drafting or supporting" the immigration laws discussed in the article.  *Id.* ¶ 81.  Likewise, "Defendants had read a Business Insider article that expressly acknowledged that CoreCivic does not lobby for any policies that 'determine the basis for or duration of an individual's incarceration or detention.'" *Id.* ¶ 82.  Although that article discusses CoreCivic's lobbying efforts,

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

it does not identify a single instance in which CoreCivic lobbied "for harsher criminal justice and immigration laws." *Id.* Defendants' only response is to assert that they "relied" in "good faith" on *other* parts of these articles that they contend support their defamatory claims. But not only does Defendants' assertion of "good faith" reliance contradict the well-pled facts in CoreCivic's complaint (and the actual substance of the articles), it is legally insufficient to negate an inference of malice at the pleading stage: A defamation-defendant "cannot [] automatically insure a favorable verdict by testifying that he published with a belief that the statements were true[;] [t]he finder of fact must determine whether the publication was indeed made in good faith." *St. Amant*, 390 U.S. at 732; *see also Palin*, 940 F.3d at 815-16.

Further, CoreCivic pled that "Defendants visited and reviewed [] publicly available information about CoreCivic" in the Lobbying Act Disclosure Database linked on Senate.gov and House.gov, ProPublica's lobbying database, and/or OpenSecrets.org's lobbying database, all of which indicate that as a matter of CoreCivic policy, CoreCivic "does not lobby for or against any policies or legislation that would determine the basis for an individual's incarceration or detention." *Id.* ¶¶ 85-90. And CoreCivic additionally pled that because Defendants targeted CoreCivic, they "visited and read CoreCivic's website, including the 'Political Activity and Lobbying Reports' section of it," which likewise explains that CoreCivic "***does not, under longstanding policy, lobby for or against any policies or legislation that would determine the basis for or duration of an individual's incarceration or detention***." *Id.*

Defendants ask the Court to ignore these well-pled facts that more than sufficiently plead actual malice, but it may not do so. Nor may the Court take judicial notice of the truth of the substance of the various articles cited in Defendants' Request for Judicial Notice.

### 3. CoreCivic's Complaint Pleads Facts Constituting Circumstantial Evidence of Actual Malice.

CoreCivic further pled substantial circumstantial evidence of Defendants' actual malice.

**Bias, Motive, And Ill Will.** "[E]vidence concerning motive," "bias," or ill will "support a finding of actual malice," *Connaughton*, 491 U.S. at 668; *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1119 (9th Cir. 2003); *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995).

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

1    Contrary to Defendants' suggestion, "circumstantial evidence of a financial motive to [defame]

2    support[s] the ultimate conclusion of actual malice." *Suzuki*, 330 F.3d at 1136; *Solano*, 292 F.3d

3    at 1086 (evidence defendant defamed plaintiff "to promote [] sales" of its products "is sufficient to

4    satisfy the actual malice standard"); *Kaelin*, 162  F.3d at 1042 ("pecuniary motive" is evidence of

5    actual malice).   Defendants, who "differentiate[] [themselves] in the[ir] industry" by pitching

6    "socially conscious" investments, Compl. ¶¶14, 17, knowingly defamed CoreCivic to "misdirect[]

7    public outrage" against it and "thereby redirect[] capital" to the "socially conscious" investments

8    they sell to profit at CoreCivic's expense, *id.* ¶¶ 14, 21-22, 46.  That is evidence of actual malice.

9        **<u>Purposeful Avoidance of the Truth.</u>**  Evidence of a defendant's "purposeful avoidance of

10   the truth" is independently sufficient to demonstrate actual malice.  *Connaughton*, 491 U.S. at 692;

11   *Suzuki*, 330 F.3d at 1134; *Masson v. New Yorker Mag., Inc.*, 960 F.2d 896, 900 (9th Cir. 1992);

12   *Antonovich v. Superior Court*, 234 Cal. App. 3d 1041, 1048 (1991).  Here, CoreCivic pled that

13   Defendants "intentionally disregard[ed]" or, at minimum, "purposefully avoid[ed] ... numerous

14   publicly available sources rebutting their false claims." Compl. ¶¶ 126, 141.  For example, even if

15   the Court were not to credit CoreCivic's well-pled facts that Defendants actually reviewed

16   numerous sources of information contradicting their defamatory claims (although the Court must

17   credit those facts), CoreCivic further pled that Defendants, at minimum, purposefully avoided those

18   sources, including publicly accessible lobbying disclosures available on Senate.gov, Congress.gov,

19   ProPublica, OpenSecrets.org, and CoreCivic's website that demonstrate that CoreCivic has ***not***

20   "spent $25M on lobbying over the past three decades to push for harsher criminal justice and

21   immigration laws," and unambiguous statements in news articles and on CoreCivic's website that

22   CoreCivic does ***not*** "operate immigrant detention facilities for children separated from their parents

23   at the [U.S.] border."  CoreCivic further pled that Defendants "purposefully avoided contacting

24   CoreCivic for comment before publication" because they knew that if they did CoreCivic would

25   provide them with evidence contradicting their claims.  *Id.* ¶ 4.  Defendants cannot avoid this

26   evidence of actual malice by noting that a defendant's mere failure to ask the target of its defamation

27   for comment or refusal to credit a bare denial of defamatory allegations may not, alone demonstrate

28   actual malice, Mot. 22, because that is not what CoreCivic pled.  Rather, CoreCivic pled that,

NEWMEYER
DILLION

among other evidence of actual malice, Defendants purposefully avoided obtaining information—from CoreCivic itself and from other sources—that would have demonstrated the falsity of Defendants' defamatory allegations.  That is well-recognized evidence of actual malice.  *See Connaughton*, 491 U.S. at 692.

**Preconceived Storyline.**  "'[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence.'"  *Harris*, 152 F. App'x at 568 (quoting 1 Rodney Smolla, Law of Defamation § 3:71 (2d ed.)); *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982).  Here, CoreCivic pled that Defendants set out with a preconceived plan to target CoreCivic because of its large market capitalization and to defame it to "misdirect[] public outrage" against it and "thereby redirect[] capital" to investments Defendants sell to profit at CoreCivic's expense—regardless of what the actual evidence showed. Compl. ¶¶ 14, 21-22, 46.

**Refusal to Retract.**  "Evidence of [a] steadfast refusal to retract [is] properly considered as bearing on the issue of actual malice."  *Tavoulareas v. Piro*, 763 F.2d 1472, 1477 (D.C. Cir. 1985);  *see also, e.g.*, *Ventura v. Kyle*, 63 F. Supp. 3d 1001, 1014 (D. Minn. 2014) ("most authorities" so hold), *rev'd on other grounds*, 825 F. 3d 876 (8th Cir. 2016); Restatement (Second) of Torts § 580A cmt. d (refusal to retract "relevant in showing recklessness at the time the statement was published"); *Ibarra v. Carpinello*, No. B220934, 2011 WL 925719, at *9 (Cal. Ct. App. Mar. 18, 2011).  Here, CoreCivic pled that despite it sending Defendants multiple letters asking them to retract their defamatory statements—and providing evidence of their falsity—Defendants refused to do so and instead doubled-down on their defamatory statements while publishing a purported "clarification" dismissing the truth as something that "CoreCivic has stated."  Compl. ¶¶ 62-63.

### CONCLUSION

For the foregoing reasons, Defendants' Special Motion to Strike should be denied.

Dated:  September 10, 2020

NEWMEYER & DILLION LLP              CLARE LOCKE LLP
By:  */s/ Michael B. McClellan*     By:  */s/ Elizabeth M. Locke, P.C.*

Michael B. McClellan                Elizabeth M. Locke, P.C. (*pro hac vice*; VA Bar 71784)

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA

1

**FILER ATTESTATION**

2

3

In accordance of Civil L.R. 5-1(i)(3), I hereby certify that I have authorization to file this document from the signatories above.

4

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.  Executed on this 10th day of September, 2020 at Irvine, California.

5

6

7

8

_/s/ C. Kendie Schlecht_
C. Kendie Schlecht

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPP'N TO DEFS.' SPECIAL MOT. TO STRIKE
3:20-CV-03792-WHA